PANHANDLE EASTERN PIPE LINE
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Michigan Gas Utilities,
et al., Intervenors.

Nos. 94–1728, 95–1131 to 95–1133, 95–1159,
95–1160, 95–1224 to 95–1226, 95–1130
and 95–1332.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 19, 1996.

Decided Sept. 10, 1996.

Henry S. May, Jr., Washington, DC, argued the causes for Pipeline petitioners and intervenors, with whom Judy M. Johnson, Catherine O'Harra, Merlin E. Remmenga, Houston, TX, John R. McDermott, Richard J. Kruse, Jr., Houston, TX, Clayton G. Smith, W. Douglas Field, Jr., and John F. Harrington were on the joint briefs. Brian D. O'Neill, Lawrence G. Acker, Michael Thompson, Shemin V. Proctor, Anthony J. Ivancovich and Michael J. Fremuth, Washington, DC, entered appearances.

Timothy N. Black, Washington, DC, argued the causes for Customer petitioners and intervenors, with whom John H. Pickering, Susan D. McAndrew, Washington, DC, Stephen J. Small, Boston, MA, and Jeffrey M. Petrash, Washington, DC, were on the joint briefs. Kenneth E. Tawney, Charleston, WV, entered an appearance.

Timm L. Abendroth, Federal Energy Regulatory Commission, Washington, DC, argued the cause for respondent, with whom Jerome M. Feit, Solicitor, and Patricia L. Weiss, Attorney, were on the brief. Jill Hall, Attorney, entered an appearance.

Steven M. Sherman entered an appearance for intervenor Citizens Gas & Coke Utility. Whitney E. Bakley entered an appearance for intervenor Indiana Gas Company, Inc. Glenn W. Letham, Washington, DC, entered an appearance for intervenor Memphis Light, Gas and Water Division City of Memphis. Richard A. Rapp, Jr. entered an appearance for intervenor Long Island Lighting Company. Peter C. Lesch entered an appearance for intervenors Cincinnati Gas & Electric Company and Union Light, Heat and Power Company. Timothy A. Beverick entered an appearance for intervenor Dayton Power and Light Company.

Kathleen L. Mazure, Washington, DC, entered an appearance for intervenor Consolidated Edison Company of New York, Inc. Olga J. Weller entered an appearance for intervenor Louisville Gas and Electric Company. Elisabeth R. Myers–Kerbal, Washington, DC, entered appearances for intervenors The Western Tennessee Municipal Group, Jackson Utility Division, City of Jackson, Tennessee and The Kentucky Cities. Thomas C. Gorak entered appearances for intervenors City of Richmond, Virginia and The City of Charlottesville, Virginia. James F. Bowe, Jr., Washington, DC, entered an appearance for intervenor Virginia Natural Gas, Inc.

Before: WALD, GINSBURG, and HENDERSON, Circuit Judges.

GINSBURG, Circuit Judge:

In these consolidated petitions, five interstate natural gas pipelines and three of their customers request review of a series of orders issued by the Federal Energy Regulatory Commission concerning the appropriate allocation of production-related costs that the Pipeline Petitioners incurred from 1980 to 1983. We deny all but one of the petitions.

## I. Background

In Title I of the Natural Gas Policy Act of 1978 the Congress capped the price of natural gas at the wellhead by setting the "maximum lawful price" for a "first sale" of natural gas. NGPA §§ 102–110, *codified at* 15 U.S.C. §§ 3312–3320 (1988), *and repealed effective Jan. 1, 1993, by* Pub.L. 101–60 § 2(b), 103 Stat. 158 (1989). Apparently concerned that this maximum lawful price scheme would discourage production of natural gas that might be especially expensive to produce, the Congress provided, in § 110(a) of the Act, that

> ... a price for the first sale of natural gas shall not be considered to exceed the maximum lawful price applicable to the first sale of such natural gas under this part if such first sale price exceeds the maximum lawful price to the extent necessary to recover—

> (2) any costs of compressing, gathering, processing, treating, liquefying, or transporting such natural gas, or other similar costs, borne by the seller and allowed for, by rule or order, by the Commission.

The Congress also provided that an interstate pipeline that incurs such costs may recover them by means of a "[g]uaranteed passthrough" to its customers. NGPA § 601, *as amended by* Pub.L. 101–60 § 3(a)(7)(B) (1989), *and codified at* 15 U.S.C. § 3431(c).

In August 1980 the Commission did indeed rule, in Order No. 94, that natural gas producers could charge in excess of the otherwise maximum lawful price in order to recover such production-related costs, but it postponed the producers' collection of these sums pending completion of a rulemaking proceeding in which the agency would determine how much to allow the producers to charge. *Order Amending Interim Regulations Under the [NGPA]* ..., 45 Fed.Reg. 53099 (1980) (Order No. 94). Two and a half years later (February 1983), the Commission issued an interim rule. *Delivery Allowances Under Section 110 of the [NGPA]* ..., 48 Fed.Reg. 5180 (Interim Rule). On the same day, in Order No. 94–A, the Commission authorized natural gas producers to collect in equal installments from March 1983 through December 1984 the Order No. 94 costs they had incurred with respect to first sales between July 1980 and March 1983. *Regulations Implementing Section 110 of the [NGPA] and Establishing Policy Under the Natural Gas Act,* 48 Fed.Reg. 5152 (1983) (Final Rule and Order on Rehearing).

In November 1984, Natural Gas Pipeline of America petitioned the Commission for authority "to institute a special, one-time, lump-sum billing procedure to recover from its customers certain retroactive Order No. 94 ... payments ... made by Natural as of December 31, 1984 ... in place of recovering these payments through the ... mechanism of Natural's regular Purchased Gas Adjustment [PGA]." *Natural Gas Pipeline of America,* 30 FERC ¶ 61,138 (Letter Order). The Commission granted Natural's petition in January 1985. *Id.* In September 1985

the Pipeline Petitioners followed Natural's lead, applying for and receiving Commission authorization to recover Order No. 94 costs incurred between August 1980 and February 1985 through a direct billing procedure whereby the Pipelines would pass these costs through to their customers in lump-sum bills based upon what the customers had purchased during that period. *Transcontinental Gas Pipe Line Corp.*, 32 FERC ¶ 61,230, *reh'g denied* 33 FERC ¶ 61,213 (1985); *Texas Eastern Transmission Corp.*, 32 FERC ¶ 61,493, *reh'g denied* 33 FERC ¶ 61,257 (1985); *Texas Gas Transmission Co.*, 33 FERC ¶ 61,032 (1985), *reh'g denied* 33 FERC ¶ 61,359 (1986); *Trunkline Gas Co.*, 33 FERC ¶ 61,217 (1985), *reh'g denied* 34 FERC ¶ 61,021 (1986); *Panhandle Eastern Pipe Line Co.*, 33 FERC ¶ 61,218 (1985), *reh'g denied* 34 FERC ¶ 61,231 (1986); *see also Panhandle*, 62 FERC ¶ 61,130 at 61,832 (1993).

Under existing PGA tariff provisions, the Pipeline Petitioners could have recovered these costs prospectively by raising the rates charged to all customers in subsequent transactions. The costs incurred prior to February 1985 would then have been passed through to the pipelines' customers based not upon their past purchases but upon their purchases from 1985 forward. *See Panhandle*, 62 FERC ¶ 61,130 at 61,832; *see also Consolidated Edison Co. of New York v. FERC*, 958 F.2d 429, 432–33 (D.C.Cir.1992); 18 C.F.R. §§ 154.301–310.

The Pipelines Petitioners no doubt preferred lump-sum direct billing because recovering Order No. 94 costs prospectively by raising commodity rates to all customers would have placed them at a competitive disadvantage relative to pipelines that had incurred lower (or no) Order No. 94 costs between 1980 and 1985—*i.e.*, pipelines that had not purchased as much gas from producers authorized to recover such expenses for first sales during that period. In Order No.94–A the Commission had clearly expressed its understanding that some of the first purchasers of natural gas that would incur Order No. 94 costs would be interstate pipelines "that may receive compensation for paying these allowances through [their PGA]

clauses." 48 Fed.Reg. at 5152. The Commission nonetheless approved direct billing because, we are now told, it had subsequently become concerned that "permitting recovery of the past costs under the PGA would distort the newly competitive gas market that [the Commission] was attempting to foster."

Columbia Gas Transmission Corp. and the Municipal Defense Group challenged the lump-sum direct-bill method of cost recovery, and in 1987 we held the method unlawful because it violated the filed rate doctrine. *Columbia Gas Transmission Corp. v. FERC*, 831 F.2d 1135 (*"Columbia I"*). On remand the Commission concluded that it had the authority to waive the filed rate doctrine in the circumstances of this case, and upon that basis reinstated its Orders approving the direct-bill method.

In 1988, the Commission ruled also that Panhandle Eastern Pipe Line could use the same method to pass along additional production-related costs that natural gas producers had been permitted to recover pursuant to Order No. 473. *Panhandle*, 44 FERC ¶ 61,173, *reh'g denied* 44 FERC ¶ 61,418 (1988); *see also Compression Allowances and Protest Procedures Under NGPA Section 110*, 52 Fed.Reg. 21660 (1987) (Final Rule). (Because the Commission and the Petitioners treat Order No. 473 costs as of a piece with Order No. 94 costs for present purposes, we shall not labor over the distinction here.) By the end of 1989, Panhandle and the four other Pipeline Petitioners—Trunkline Gas, Transcontinental Gas Pipe Line (Transco), Texas Eastern Transmission, and Texas Gas Transmission Corp.—had collected a total of $44.5 million in Order No. 94 and Order No. 473 costs from the three Customer Petitioners—Columbia, Michigan Consolidated Gas (MichCon), and Michigan Gas Utilities (MGU). Then, in 1990, upon concluding that the FERC does not have the authority to waive the filed rate doctrine, we again vacated its Orders and remanded for further proceedings. *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791 (*"Columbia II"*).

In 1991 Panhandle and Trunkline obtained Commission approval of settlements with

"customers representing about 95 percent of the costs." *Panhandle*, 62 FERC ¶ 61,130 at 61,833, 61,835, *reh'g denied* 64 FERC ¶ 61,-218 (1993); *Trunkline*, 62 FERC ¶ 61,131 at 61,838, 61,840 (1993). Panhandle had not, however, settled its differences with Mich-Con, and neither Panhandle nor Trunkline could come to terms with MGU. By December 1991 Transco had obtained Commission approval of settlements with all but one of its customers, namely Columbia. *See Transcontinental*, 62 FERC ¶ 61,129 at 61,828, 61,830 (1993).

In September 1991 Panhandle and Trunkline attempted to mitigate their refund liability by recovering a share of their costs from their non-settling customers. They proposed to do retroactively what they claim they could have done prospectively in 1985: Instead of determining each customer's share of the costs incurred prior to 1985 based upon that customer's purchases prior to 1985 and directly billing each customer for its share, they would determine the shares based upon each customer's Contract Demand Quantity for the twelve months following September 1985 and impose a surcharge on the customer's contract demand each month. In other words, the Pipelines proposed to recover the past costs by imposing a surcharge upon what were then contractual entitlements to purchase gas in the future. *See, e.g., Panhandle*, 62 FERC ¶ 61,130 at 61,833–34; *Trunkline*, 62 FERC ¶ 61,131 at 61,839.

In March 1992 Transco sought Commission authorization to institute a similar billing procedure in order to recover Order No. 94 costs from Columbia. In February 1993 the Commission denied each pipeline's request. *Panhandle*, 62 FERC ¶ 61,130 (1993), *order on reh'g* 64 FERC ¶ 61,218 (1993), *order on remand* 69 FERC ¶ 61,048 (1994), *reh'g denied* 70 FERC ¶ 61,167 (1995); *Trunkline*, 62 FERC ¶ 61,131 (1993), *order on reh'g* 64 FERC ¶ 61,129 (1993), *order on remand* 69 FERC ¶ 61,047 (1994), *reh'g denied* 70 FERC ¶ 61,166 (1995); *Transcontinental*, 62 FERC ¶ 61,129 (1993), *reh'g denied* 64 FERC ¶ 61,220 (1993). The Commission or-

dered Panhandle and Trunkline to reimburse MichCon and MGU for such lump-sum charges as it had already collected, plus interest, *Panhandle*, 62 FERC ¶ 61,130 at 61,-836; *Trunkline*, 62 FERC ¶ 61,131 at 61,841, and gave Transco the option of either making a similar refund to Columbia or of responding to Columbia's proposed compromise. *Transcontinental*, 62 FERC ¶ 61,129 at 61,-830.

On the same day the Commission approved settlements between Columbia and four of the Pipeline Petitioners—Panhandle, Trunkline, Texas Eastern, and Texas Gas. 62 FERC ¶¶ 61,133, 61,137, 61,138 (1993). The settlements were conditioned, however, upon Columbia's ability to pass the settlement costs along to its customers under a settlement agreement into which Columbia and its customers had entered in 1985. When the Commission later held that Columbia could not do this, the agency simultaneously vacated Columbia's settlement agreements with these Pipelines, and ruled that Columbia was entitled to recover the amounts it had paid each pipeline. Contrary to the earlier decisions, however, the Commission ruled that the Pipelines did not have to pay interest on what they owed, *Panhandle*, 66 FERC ¶ 61,-034, *reh'g denied* 69 FERC ¶ 61,065, *reh'g denied* 69 FERC ¶ 61,358 (1994); *Texas Eastern*, 66 FERC ¶ 61,035, *reh'g denied* 69 FERC ¶ 61,064, *reh'g denied* 69 FERC ¶ 61,-356 (1994); *Texas Gas*, 66 FERC ¶ 61,033, *reh'g denied* 69 FERC ¶ 61,068, *reh'd denied* 69 FERC ¶ 61,357 (1994), thereby denying $24.1 million of the $53.5 million refund that Columbia had requested.*

The Commission subsequently modified its earlier rulings to relieve Panhandle and Trunkline of their obligations to pay interest to MichCon and MGU. *Panhandle*, 69 FERC ¶ 61,048, *reh'g denied* 70 FERC ¶ 61,167; *Trunkline*, 69 FERC ¶ 61,047, *reh'g denied* 70 FERC ¶ 61,166. Panhandle and Trunkline had already refunded principal and interest of $9.8 million to MichCon and $3.1 million to MGU. MichCon and MGU each refused to remit the interest component and the Commission has since ordered them to

* After oral argument Panhandle and Columbia settled their difference; nothing in this opinion should be construed to affect the rights of either party under their agreement.

pay interest on the un-remitted amount. *Panhandle*, 71 FERC ¶ 61,039 (1995) (denying rehearing on this issue).

Meanwhile, in October 1993 (approximately eight months after the Commission had rejected Transco's request for authorization to direct-bill Columbia) Transco and Columbia had asked the Commission to approve their own proposed settlement, under which Transco would refund to Columbia $1.4 million, inclusive of principal and interest. Less than three months later Columbia changed its mind and filed a letter with the Commission stating that it no longer supported the proposed settlement; and about a year later the Commission rejected the settlement and held Transco liable to Columbia for the entire amount of its unlawful direct bill ($6.9 million), but not for interest. *Transcontinental*, 70 FERC ¶ 61,160, *order on reh'g*, 71 FERC ¶ 61,108 (1995). According to Columbia, this brought the total interest it was denied to $32.4 million, or almost half of Columbia's $69.7 million total claim against the Pipeline Petitioners.

In sum, the Commission arrived at what it must have considered a Solomonic solution to a problem for which it forthrightly accepts the blame: the customers get back the principal amount of the unlawful charges they paid, but the pipelines get the time value of the money for the period during which they had use of it—a roughly even split of the total sum in dispute. But the Israelite was more fortunate than the Commission; none of the claimants before the agency was willing to say of the entire sum in dispute, "Let it be neither mine nor thine, but divide it." I KINGS 3:26 (King James). Both sides want it all.

## II. Analysis

There are four principal claims before us. We turn first to the two aimed at the Commission's Solomonic approach to allocating responsibility for the costs here at issue: (1) the Pipeline Petitioners' claim that the Commission erred by requiring them to refund the principal sums that they unlawfully (albeit with the agency's approval) collected from the Customer Petitioners; and (2) the Customer Petitioners' claim that the Com-

mission erred by not requiring the Pipelines to pay interest to them on those sums. Regardless how we resolve these two claims, we must then address two more: (1) the claims of MichCon and MGU that, because they no longer have contracts with Panhandle or Trunkline, the Commission lacks authority to order them to refund the interest payments they have already collected from those pipelines; and (2) Transco's claim that the Commission erred in rejecting its proposed settlement with Columbia.

## A. The Commission's Apportionment of Liability between the Pipelines and the Customers

The Pipelines, the Customers, and the Commission all agree that following the remand in *Columbia II* the Commission's task was equitably to allocate the production-related costs at issue between the Pipelines and the Customers. No Petitioner disputes that doing so required the agency to make some attempt to ascertain and then restore the parties to the positions in which they would have been but for the FERC's legal error in 1985, nor does anyone doubt that the agency's discretion in fashioning an equitable remedy is very broad. The Petitioners argue, however, that the Commission has violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (E), by determining the equities in an arbitrary and capricious manner and without the support of substantial evidence in the record.

As we have seen, the Commission purported to resolve the dispute between the Pipelines and the Customers by first holding the Pipelines liable to the Customers for the monies improperly collected but then excusing the Pipelines from paying interest on those sums. Because the principal and interest at stake are roughly equal, however, the result is roughly the same as it would be if the Commission had ordered the Pipelines to refund only half of what they unlawfully collected, plus interest. The Commission adopted the solution it did primarily because the agency found that "there is no way to restore the parties to the positions they would have occupied had there been no Commission error"; the agency could not deter-

mine what the parties would have done if the Commission had not accepted the unlawful direct bill proposal. *See, e.g., Panhandle,* 70 FERC ¶ 61,167 at 61,522.

There are two ways to attack the Commission's reasoning, and each group of Petitioners has tried both. First, each group argues that the Commission could have ascertained how the production-related costs would have been allocated but for the agency's error. (Of course, each side presents an analysis that would entitle it to a better than even split of the total amount in dispute.) Second, each group presents equitable claims that, as we understand them, are in essence arguments that the Commission should have allocated the burden of uncertainty more to one side than to the other. We take up the Pipelines' pair of arguments first, and then the Customers'.

### 1. The Pipelines' Refund Obligations

 Our cases establish that a pipeline may recover from a customer costs that the pipeline incurred in the past in order to provide service in the past only if the customer (1) had sufficient notice that it was liable for those costs, or (2) is given notice that future purchases will carry a surcharge. *See Transwestern Pipeline Co. v. FERC,* 897 F.2d 570, 579–80 (D.C.Cir.1990) (filed rate doctrine violated by direct billing costs incurred to provide service prior to notice that customer would be directly liable); *Public Utilities Comm'n of California ["CPUC"] v. FERC,* 988 F.2d 154 (D.C.Cir.1993) (doctrine not violated by recovery of past costs through volumetric surcharge imposed upon future throughput); *Western Resources, Inc. v. FERC,* 72 F.3d 147, 152 (D.C.Cir.1995) (doctrine not violated by billing based upon current contract demand to recover take-or-pay settlement costs pipeline incurred in past in order to provide ·service in future; such costs may be treated as current). Of course, even costs that a pipeline has incurred in order to provide current or future service cannot be retroactively billed to customers based upon their past purchasing decisions. *Associated Gas Distributors v. FERC,* 893 F.2d 349, 354–56 (D.C.Cir.1989).

The Pipeline Petitioners claim that if the Commission had disapproved the direct-billing proposals that they submitted in 1985, then the Pipelines could have recovered their Order No. 94 costs from the Customer Petitioners through an alternative that would have provided more certain recovery than the PGA. Specifically, they say that they could have allocated the pre–1985 production-related costs to the Customer Petitioners based upon the customers' then-existing contractual entitlements to purchase gas during the next 12 months, amortizing each customer's share over that period. *See, e.g., Panhandle,* 69 FERC ¶ 61,065 at 61,279. Indeed, in 1991 the Pipelines asked the Commission to authorize this billing method retroactively by excusing the Pipelines from refunding what they could have recovered had they implemented that method in 1985. *See, e.g., Panhandle,* 62 FERC ¶ 61,130 at 61,833–34. The Commission declined, initially upon equitable grounds but ultimately upon the ground that the Pipeline Petitioners' 1991 proposal was based upon a cost-recovery method that would have violated the filed-rate doctrine in 1985.

The Pipelines challenge that conclusion, and our analysis begins there. After determining whether the Pipelines' recovery of Order No. 94 costs through a demand-based surcharge would have violated the filed rate doctrine, we turn to the other factors that, according to the Pipelines, the Commission failed properly to consider in devising an equitable remedy in this case.

*(a) The Pipelines' Ability to Recover Order No. 94 Costs through a Demand–Based Surcharge in 1985*

In its initial ruling on the subject, the Commission characterized the Pipelines' proposals as calling for retroactive increases in their rates for 1985 sales service; the Commission's basis for rejecting these proposals, however, was not the filed rate doctrine. Instead, claiming equitable authority to remedy the consequences of its own legal error by approving retroactive rate changes, the Commission found it "more appropriate" to order refunds of the "erroneously collected"

sums. *See, e.g. Panhandle,* 63 FERC ¶ 61,-130 at 61,835.

At the heart of the Commission's reasoning were two insights: first, "as the proponent of the action held to be erroneous on appellate review, [the Pipelines have] less justification to seek the benefit of the Commission's exercise of [its] equitable remedial authority [ ] than the customers who were required to pay the illegal charge"; and second, the Pipelines had undertaken direct-billing "with the knowledge that [it] was subject to judicial review." *Id.* Indeed, the Commission observed that equitable remedies are generally granted in order to make whole the prevailing, not the losing, party in a legal dispute. *Id.* Finally, the Commission found that the pipelines had failed to establish "any significant relationship" between the service received by the Customers in 1985 and the Pipelines' incurrence of Order No. 94 costs. *Id.*

On rehearing, however, the Commission shifted the basis for its rejection of the Pipelines' proposal from equity to law: the FERC concluded that the filed rate doctrine would have precluded the Pipeline Petitioners' attempt to recover pre–1985 production-related costs based upon their customers' contract demand in 1985. See, e.g., *Panhandle,* 64 FERC ¶ 61,218 at 62,634 (1993); *reh'g denied* 69 FERC ¶ 61,065 (1994). The Commission concluded that, although not a direct bill, the Pipeline Petitioners' proposed demand surcharge would have violated the filed rate doctrine because it recovered costs incurred in order to provide sales service rendered before the Customer Petitioners had notice that the Pipelines could pass along the costs to them in any way other than through the PGA. *See, e.g.,* 69 FERC ¶ 61,065 at 61,279. The Commission therefore found the Pipeline Petitioners' 1991 proposal "indistinguishable" from the direct bill that this court had rejected in *Transwestern,* 897 F.2d at 579–80. *Id.* at 61,277–78.

The Pipeline Petitioners argue that the Commission's conclusion is inconsistent with its own orders and a decision of this court permitting pipelines to recover take-or-pay settlement costs through a contract demand surcharge. *See, e.g., Western Resources,* 72

F.3d at 152. The Commission points out, however, that the take-or-pay settlement costs at issue in those cases, although incurred prior to giving notice of the contract demand surcharge, related to sales service to be performed thereafter and for that reason could be treated as a current cost as of the time of notice. *Id.*

The Commission, of course, declined to treat the production-related costs at issue here as current. Here's why:

> [T]he Order No. 94 costs have none of the attributes of the take-or-pay settlement costs that have permitted the Commission to treat take-or-pay costs as current costs. The Order No. 94 costs represent additional charges by producers to [the Pipeline Petitioners] for gas that they actually purchased and resold to their sales customers during the 1980–1985 period. Unlike the take-or-pay settlement costs, [the Pipeline Petitioners] did not, through their incurrence of the Order Nos. 94 and 473 costs obtain any future benefits such as the termination or reformation of its gas purchase contracts. Also, the Order Nos. 94 and 473 costs were incurred based solely on [the Pipeline Petitioners'] purchases from the producers during the 1980–1985 period. Unlike the situation with respect to take-or-pay, they obtained no future make-up rights to take gas in the future through their incurrence of the Order Nos. 94 and 473 costs. The Order Nos. 94 and 473 costs thus bear no relationship to [the Pipeline Petitioners'] performance of post–1984 sales service. [I]t is this fact that would have rendered any direct bill or demand surcharge to the sales customers, even if proposed in 1985, a surcharge for the 1980–1985 service.

*Panhandle,* 69 FERC ¶ 61,065 at 61,279–80; *see also, e.g., Texas Gas,* 69 FERC ¶ 61,068 at 61,296–97.

In response, the Pipelines assert that Order No. 94 costs "relate to the future [ ] in precisely the same way as take-or-pay costs." The assertion is supported, however, only by an inapposite finding made by the Commission in *National Fuel Gas Supply Corp.,* 44 FERC ¶ 61,293 at 62,059 (1988), and the Pipelines' own observation that the point of

permitting natural gas producers to recover Order No. 94 costs was to spur increases in natural gas production. So it was, but that gets the Pipelines nowhere. The prospect of recovering production costs incurred from 1980 to 1983 no doubt did spur production during that time, but not thereafter. The Pipelines have identified no basis upon which the Commission could have treated Order No. 94 costs incurred between 1980 and 1983 as "current" in 1985.

The Pipeline Petitioners also emphasize the distinction between a direct bill based upon past purchases and a surcharge based upon existing contract demand. *Panhandle,* 69 FERC ¶ 61,065 at 61,279. Although the Commission may "establish, and [ ] alter prospectively, fixed charges such as demand charges," *Transwestern,* 897 F.2d at 579, the Pipeline Petitioners offer no persuasive reason why the Commission could have treated Order Nos. 94 and 473 costs as fixed; they were in fact, as the Commission pointed out, "solely ... costs of performing sales service during the period 1980–1985." *Panhandle,* 69 FERC ¶ 61,065 at 61,279. As they were not fixed costs, the Pipeline Petitioners (in 1985) could have recovered them only through the PGA, of which the Customers already had notice, or through some other allocation method based upon the Customers' future purchasing decisions, *see CPUC,* 988 F.2d at 160 ("the relevant inquiry [is] to 'identify the purchase decisions to which the costs are attached' "), quoting *Associated Gas,* 893 F.2d at 353, even if the Customers had no practical alternatives to purchasing gas from these pipelines, *see Transwestern,* 897 F.2d at 579.

■ In their reply brief the Pipeline Petitioners point, for the first time, to the Commission's decision in *Transwestern Pipeline Co.,* 67 FERC ¶ 61,237, *reh'g denied* 73 FERC ¶ 61,091 (1995), which they say is inconsistent with the agency's reasoning in this case. As the Commission has not had a proper opportunity to respond to the argument, however, we shall not take it up here. *See Forman v. Korean Air Lines Co., Ltd.,* 84 F.3d 446, 448 (D.C.Cir.1996) ("Ordinarily, we will not entertain arguments or claims raised for the first time in a reply brief").

Having failed to establish that they had a means other than the PGA mechanism for recovering the production-related costs that they incurred prior to 1985, the Pipelines cannot demonstrate that they would have come out better, but for the Commission's error in 1985, than they do in the orders under review. They do not dispute the Commission's findings that "market conditions might well have prevented full recovery of the costs" through the PGA and that "it is possible that the settlements [with other customers] that the Commission has already approved have enabled [the Pipelines] to recover as much, or more, of these costs than [they] could have recovered in the absence of the Commission's error." *Panhandle,* 64 FERC ¶ 61,218 at 62,636–37.

*(b) Equitable Factors Regarding the Risk of Uncertainty: The Pipelines' Argument*

■ The Pipeline Petitioners' other equitable arguments do not establish any compelling reason why the Commission must allocate more of the burden of uncertainty to the Customers. That the Commission's policy in 1985 induced the Pipeline Petitioners to pursue the unlawful direct-billing scheme does not implicate the Customers. Nor is the Pipeline Petitioners' entitlement under § 601(c)(2) of the NGPA to pass production-related costs through to their customers a guarantee of full cost-recovery. That provision instructs the Commission not to deny cost-recovery to interstate pipelines, but it neither requires nor permits the FERC to approve a cost-recovery method that the Congress elsewhere prohibited. The only method of cost-recovery that would have passed muster under the filed rate doctrine was the PGA mechanism, and the Commission's undisputed finding is that, had the Pipeline Petitioners used the PGA, the market might have left them no better off than they are now.

Two other claims made by the Pipeline Petitioners are simply false. First, the Pipelines claim they were "merely accounting conduits" that "did not benefit from or retain for their own use the funds collected [from the Customers] to cover Order No. 94 costs."

The Commission endorsed this characterization of the Pipelines' role, *see, e.g., Panhandle,* 69 FERC ¶ 61,065 at 61,283, but it would be accurate only if the Pipelines' obligation to pay Order No. 94 costs to the producers from which they purchased natural gas were contingent upon their recovering sufficient funds from the Customers. As the Pipeline Petitioners' current predicament shows, that is not the case.

Second, the Pipeline Petitioners say that the Customers "caused [them] to incur the Order No. 94 costs." Although the Customers received the gas and in that sense benefitted from the production-related costs at issue, the Pipeline Petitioners do not allege that the Customers in any way required the Pipeline Petitioners to purchase gas that was subject to Order No. 94 deferred charges rather than find other, cheaper sources.

Moreover, although the Customers did benefit from their use of the gas, it is far from clear that, as the Pipelines suggest, the Commission's orders leave the Customers any better off than they would have been had the Commission not erred in 1985. The Customers may have initially underpaid by more than $40 million, but the Commission's decision to deny them interest on the sums unlawfully collected from them effects a transfer from the Customers to the Pipeline Petitioners of more than $38 million. As we have already noted, the result is roughly the same as if the Commission had permitted the Pipelines to bill the Customers directly for half of the $40 million, and the Pipelines have not established that they could have recovered even that, let alone more, in the market and legal circumstances of the time. The Pipeline Petitioners are in no position to argue that the Commission has turned a deaf ear to equity on this point. *See, e.g., Panhandle,* 69 FERC ¶ 61,065 at 61,282 ("no equitable reason why Columbia should receive the windfall of escaping all liability simply because of the Commission's error").

### 2. The Customers' Entitlement to Interest

Like the Pipeline Petitioners, the Customers argue that the Commission unreasonably rejected their argument that, but for the agency's legal error in 1985, the Customers would have fared better than they do under the orders here challenged. We turn to that claim first, and then to the Customers' other equitable arguments suggesting that even if the Commission could not determine the precise effect of its error, the Pipelines should bear more of the burden of uncertainty than should the Customers.

### (a) Hypothetical PGA Recovery

The Customers argue that the Commission unreasonably disregarded evidence demonstrating that under the only cost-recovery method available to the Pipeline Petitioners in 1985 (*i.e.,* the PGA) the Customers would have paid in some cases nothing and in others far less than the cost that the Commission effectively imposed upon them when it denied them interest. The Customers do not dispute, however, that their presentations to the Commission were based upon two assumptions that the Commission declined to adopt. *Panhandle,* 69 FERC ¶ 61,048 at 61,-190–91, *reh'g denied* 70 FERC ¶ 61,167; *Trunkline,* 69 FERC ¶ 61,047 at 61,184–85, *reh'g denied* 70 FERC ¶ 61,166; *Panhandle, reh'g denied* 69 FERC ¶ 61,065.

First, the Customers assumed that even if the Commission had not endorsed direct-billing as the appropriate method of cost recovery, the pipelines would not have turned to the PGA any earlier than the dates on which they filed for authorization to bill the Customers directly. The Commission reasonably rejected this assumption. The Customers offered no reason to believe that, if the Commission had rejected rather than approved direct billing proposals in January and June of 1985, *see* 30 FERC ¶ 61,138; *Tennessee Gas Pipeline Co.,* 31 FERC ¶ 61,-308 (1985), the Pipelines would not have turned immediately to their PGAs as the only lawful means of recovering Order No. 94 costs. Second, the Commission rejected the Customers' assumption that the Pipelines would have amortized their past Order No. 94 costs over a single year. The Customers offer no reason why the Pipeline Petitioners would not have proposed and the Commission would not have authorized a longer amortization period in order to keep the

Pipelines from pricing themselves out of the market.

As the Commission made clear, without the benefit of these assumptions the Customers cannot show that they would have paid little or nothing, as they variously claim, had the Pipelines attempted to recover their Order No. 94 costs through the PGA rather than by direct billing. Therefore, their charge that the Commission departed without explanation from its own general rule—that a customer entitled to a refund should also be awarded interest in order to make it whole—is beside the point. If the Commission could not reasonably determine what would make each party whole, and had no reason to impose a greater share of the burden of uncertainty upon one party than the other, then ordering a refund of principal without interest at a time when the principal and interest are of roughly equal value is a reasonable compromise. *See Consumer Federation of America v. FPC,* 515 F.2d 347, 358 (D.C.Cir.1975) ("While full refund under an invalid order is a sound basic rule, it may be offset, at least in part, by the lack of a mechanism to restore the full status quo ante").

### (b) Equitable Factors Regarding the Risk of Uncertainty: The Customers' Argument

■ As a threshold matter, the Customers argue that we should not defer to the Commission's discretionary decision to deny interest because the agency reversed its position in this case without explanation. The challenged orders, however, quite plainly manifest the Commission's reasoning: faced with the impenetrable uncertainty regarding the effect that its legal error had visited upon all the Pipeline Petitioners, the Commission did the best that it could to muddle through. The Customers do not deny that they benefitted from the gas for which the Pipelines incurred the production-related costs now at issue, and they have failed to establish that but for the Commission's legal error they would have incurred a lesser cost than the FERC imposed upon them by denying them interest on the sums unlawfully taken from them.

The Customers' strongest argument for requiring the Pipeline Petitioners to shoulder a greater share of the burden of uncertainty is that the Pipelines created the uncertainty when in 1985 they sought authority for direct billing in order to serve their own interests. Indeed, as noted earlier, the Commission initially ordered full refunds with interest, in part upon the equitable ground that "as the proponent[s] of the action held to be erroneous on appellate review, [the Pipeline Petitioners have] less justification to seek the benefit of the Commission's exercise of [its] equitable remedial authority [ ] than the customers who were required to pay the illegal charge," and that the Pipeline Petitioners had undertaken to bill directly "with the knowledge that [it] was subject to judicial review." *See, e.g. Panhandle,* 63 FERC ¶ 61,130 at 61,835.

In *Public Utilities Comm'n of Calif. v. FERC,* 988 F.2d 154, 163 (D.C.Cir.1993), we held that the Commission may exercise its remedial authority to relieve a party from the "predicament" caused by that party's reliance upon an illegal order even if the illegal order merely "induced" rather than "compelled" the party to act. Here the Customer Petitioners challenge the Commission's finding that the agency's legal error even induced the Pipeline Petitioners to pursue authority for direct billing.

In January 1985 the Commission approved Natural Gas Pipeline Company's largely unopposed proposal for direct billing. *See* 30 FERC ¶ 61,138. The Commission's order includes no express endorsement of direct billing as the preferred method for recovering Order No. 94 costs, however.

In June 1985 the Commission authorized another pipeline to bill customers directly for production-related costs that the pipeline had incurred under §. 110 of the NGPA. *Tennessee Gas Pipeline,* 31 FERC ¶ 61,308. The Customers do not dispute that this order could have induced the Pipeline Petitioners to pursue direct-billing authorization in order to recover their Order No. 94 costs.

These two orders seem to be all the Commission-generated inducement that Texas Eastern had when it, first among the Pipe-

line Petitioners, filed for direct-billing authorization in July 1985. *See Texas Eastern*, 66 FERC ¶ 61,035, *reh'g denied* 69 FERC ¶ 61,-064 (1994). In finding that Texas Eastern should not be "blamed" for pursuing this course because "the Commission's acceptance of other pipelines' Order No. 94 direct bill proposals placed Texas Eastern under competitive pressures to propose a similar recovery mechanism," 69 FERC ¶ 61,064 at 61,270, the Commission did not cite its January and June 1985 orders. It did do so, however, in reaching a similar conclusion regarding Texas Gas, which applied for direct-bill authorization a few weeks later, in August 1985. *Texas Gas,* 69 FERC ¶ 61,068 at 61,300 n. 42, *denying reh'g of* 66 FERC ¶ 61,033 (1994). The Commission also cited two orders issued very shortly after these pipelines filed their direct-bill petitions. 69 FERC ¶ 61,068 at 61,300 nn.42 & 43, citing 32 FERC ¶ 61,230 (August 1985) and 32 FERC ¶ 61,433 (September 1985). While Texas Eastern and Texas Gas obviously did not rely upon those orders, they are evidence of the contemporaneous policy that, the Commission found, induced the Pipeline Petitioners to pursue direct billing authority. That Texas Eastern and Texas Gas succeeded in obtaining Commission approval for their direct-bill proposals suggests that they had correctly sensed a policy shift in the January and June orders. In any event, the Commission's assessment of the competitive climate created by its own orders merits substantial deference; we therefore hold that the Commission reasonably concluded that it induced the Pipeline Petitioners to jump on the direct-bill bandwagon.

Next the Customer Petitioners point to the Commission's finding that the Pipelines' settlements with other customers may have given them greater cost-recovery than the PGA mechanism would have. *See, e.g., Panhandle,* 64 FERC ¶ 61,218 at 62,636–37. This possibility, however, provides no basis (either descriptive or normative) for the conclusion that the Customers draw, namely, that "as a result of these settlements, the Pipeline Petitioners had voluntarily assumed the risk that they might not recover *any* production-related costs from Columbia, MichCon, and MGU."

The Customers make two final points. First, they argue that even if the Pipeline Petitioners experienced a decrease in gas sales after the Commission approved their proposals for direct-billing, *see, e.g., Panhandle,* 69 FERC ¶ 61,048 at 61,193, they avoided the competitive disadvantage entailed in having to recover their costs by increasing their commodity price. Second, the Customers contend that the FERC erred when it found that the Pipelines did not have use of the monies they unlawfully collected from the Customers. Each point provides a good reason to impose substantial costs upon the Pipeline Petitioners—as the Commission did—but neither provides a reason for holding the Pipeline Petitioners more responsible than the Customers for the uncertainty that hangs over this case.

The Commission gave each group of Petitioners an opportunity to demonstrate that, but for the agency's legal error, they would have fared better than they do under the orders challenged here. Neither has succeeded; the uncertainty is simply too great.

## B. The Commission's Jurisdiction over MichCon and MGU

Before the Commission reconsidered its position regarding interest, it required Panhandle and Trunkline to refund both principal and interest to MichCon and MGU. Upon reconsideration, the Commission ordered MichCon and MGU to refund the interest portion of that payment, with interest. MichCon and MGU argue that the Commission had no power to issue that order because their contractual relationships with Panhandle and Trunkline had expired by then.

The Customers see no jurisdictional impediment to the Commission's having ordered Panhandle and Trunkline to refund principal and interest to them even though that order also came after the contractual relationships had expired. The significant difference, they say, is that the first order required a refund of charges unlawfully collected during the contractual relationship, whereas the second imposed a surcharge based upon past sales service.

That distinction cannot help the Customers in light of our decision in *Natural Gas Clearinghouse v. FERC*, 965 F.2d 1066, 1073 (1992), where we held that the Commission's remedial authority to undo the effect of its past legal error includes the authority to impose a retroactive surcharge (that does not violate the filed rate doctrine) as well as to extract a retroactive refund. Here the Commission has in effect imposed a retroactive surcharge based upon the Pipelines' entitlement to recover production-related costs through the PGA after 1985—an entitlement forgone in reliance upon the Commission's erroneous policy at that time. That surcharge does not violate the filed rate doctrine (and the Customers have not argued that it does) because, in 1985, the Customers had notice that the Pipelines were attempting to recover their production-related costs and knew that the Pipelines could do so through the PGA.

## C. The Transco–Columbia Settlement

█ It is hard to believe that having created such a mess the Commission would then disapprove a settlement agreement between two of the feuding parties just because one would have done better by not settling, but that is just what the Commission did. Columbia had agreed, contingent solely upon Commission approval, to accept a refund of $1.3 million and allow Transco to keep the remainder of what it had improperly billed Columbia. *Transcontinental*, 70 FERC ¶ 61,160 at 61,491–92. The parties had calculated the refund figure based, in part, upon what they thought Transco could have directly billed Columbia in 1985 on a contract-demand basis. *Id.* Unlike the settlements between Columbia and the other Pipelines, Columbia's settlement with Transco was not conditioned upon Columbia's ability to pass Order No. 94 costs along to its customers. *Transcontinental*, 71 FERC ¶ 61,108 at 61,-357.

The Commission declined to approve the settlement solely because—as the agency revealed in rulings it made after Columbia filed the settlement—Columbia would have fared better had it insisted that any attempt to recover the costs at issue through a direct bill would have violated the filed rate doctrine. *Id.* at 61,357. The Commission did so despite "any waiver of the filed rate doctrine which might have resulted from Columbia's agreement to the rejected settlement." *Id.* That was a startling abuse of the Commission's discretion to reject a settlement proposal.

Neither Columbia nor the Commission suggests that Columbia's decision to settle was in any way tainted as by fraud or duress. True, we have held that the Commission should approve an uncontested settlement "only upon a finding that the settlement appears to be fair and reasonable and in the public interest." *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1003 (D.C.Cir.1990). That Columbia would have fared better by fighting than by settling, however, is not a sufficient basis upon which to conclude that approving the settlement would be unfair, unreasonable, or contrary to the public interest. Parties settle in order to avoid the risk that they might do worse by litigating, both because they might lose and because winning might come at a high cost; both parties to a settlement accept the risk that they might have done better by fighting. It is perverse, therefore, to reject a settlement because later developments make one party's decision appear unwise. Rejecting a settlement upon such a flimsy ground only diminishes the incentive of future disputants to settle their cases.

## III. Conclusion

Neither the Pipeline nor the Customer Petitioners have established that under the unique and very difficult circumstances of this case the Commission acted arbitrarily and capriciously; indeed the Petitioners have failed to establish that the Commission could have crafted a more equitable remedy than it did. Contrary to the argument of MichCon and MGU, the Commission certainly has authority to require them to refund the interest payments they collected from the Pipelines.

For these reasons, we deny the petitions for review of all the orders at issue, save one. Because the Commission sorely abused its discretion in rejecting the Transco–Columbia settlement, we vacate that order and remand

for the Commission to enter an order approving the settlement.

*So ordered.*