# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 11, 2007      Decided January 22, 2008

No. 06-1042

BURLINGTON RESOURCES INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PANHANDLE EASTERN PIPE LINE COMPANY AND
NORTHERN NATURAL GAS COMPANY,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Thomas J. Eastment* argued the cause for petitioner. With him on the briefs was *Bruce A. Connell*.

*Judith A. Albert*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Frank X. Kelly* argued the cause for intervenors. With him on the brief were *Steve Stojic* and *James F. Moriarty*.

Before: SENTELLE and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Burlington Resources Inc. (which, with its predecessors-in-interest, we will call "Burlington") is a producer of natural gas. Three years ago, in *Burlington Resources Oil & Gas Co. v. FERC* ("*Burlington I*"), 396 F.3d 405 (D.C. Cir. 2005), it challenged orders of the Federal Energy Regulatory Commission requiring it to return part of the money collected in long-past gas sales from two pipeline gas purchasers, Northern Natural Gas Co. and Panhandle Eastern Pipe Line Co. Burlington argued that it had settled all disputes with the two pipelines over these sales many years before, and that the Commission erred by failing to give effect to its settlements (the "Burlington Settlements"). We remanded for a more adequate explanation of FERC's position, particularly in light of its decision to approve similar settlements between the two pipelines and other gas producers (the "Omnibus Settlements"). *Id.* at 406, 412.

On remand, the Commission reaffirmed its orders, proposing a number of distinctions between the Burlington Settlements and the Omnibus Settlements. *Burlington Res. Oil & Gas. Co.* ("*Remand Order*"), 112 FERC ¶ 61,053, *reh'g denied* ("*Rehearing Order*"), 113 FERC ¶ 61,257 (2005). Burlington again petitions for review. Because the Commission's distinctions ultimately prove illusory, we grant the petition and vacate the orders. We need not reach Burlington's alternative request for equitable adjustment of its obligations under § 502(c) of the Natural Gas Policy Act ("NGPA") of 1978, 15 U.S.C. § 3412(c).

3

* * *

Burlington's alleged liability arose under § 601 of the NGPA, which for many years imposed maximum lawful price ceilings on first sales of natural gas. 15 U.S.C. § 3431 (1982) (amended effective 1993, as part of Congress's repeal of the NGPA price ceilings). The statute allowed producers to charge above the maximum, however, to recoup the cost of any state "severance, production, or similar tax." NGPA § 110(a), (c), 15 U.S.C. § 3320(a), (c) (1982) (repealed effective 1993). The Commission at first interpreted this provision to allow recoupment of the Kansas *ad valorem* property tax, though not certain other state taxes; in a 1988 decision we required the Commission to justify this difference in treatment. *Colorado Interstate Gas Co. v. FERC*, 850 F.2d 769, 770, 774-75 (1988).

In 1993 the Commission ruled that reimbursements for the Kansas tax could not be added to the maximum price, and it required first sellers of gas to refund some of the tax-related revenues they had collected. *Colorado Interstate Gas Co.*, 65 FERC ¶ 61,292, at 62,372 (1993). ("First sellers" is a technical term, but for our purposes here is equivalent to gas producers.) In *Public Service Co. of Colorado v. FERC*, 91 F.3d 1478 (D.C. Cir. 1996), we upheld this decision (with a tweak as to retroactivity). The Commission took action in 1997, ordering the pipelines purchasing Kansas gas to serve first sellers with a "Statement of Refunds Due" for the period from 1983 to 1988. *Pub. Serv. Co. of Colorado*, 80 FERC ¶ 61,264, at 61,955 (1997), *aff'd in relevant part*, *Anadarko Petroleum Corp. v. FERC*, 196 F.3d 1264, 1271 (D.C. Cir. 1999), *reh'g*, 200 F.3d 867 (D.C. Cir. 2000).

To avoid litigation, the Commission encouraged Kansas gas producers to settle their refund disputes with pipelines. In 2000 and 2001 the Commission approved Omnibus

Settlements for Northern and Panhandle, respectively, under which the settling producers paid only a portion of their refund liabilities, and the two pipelines waived any claim to further refunds. *Northern Natural Gas Co.* ("*Northern Omnibus*"), 93 FERC ¶ 61,311, at 62,075 (2000); *Panhandle E. Pipe Line Co.* ("*Panhandle Omnibus*"), 96 FERC ¶ 61,274, at 62,039-40 (2001).

Burlington, however, refused to join these agreements. During the period of uncertainty between our remand in *Colorado Interstate Gas* and the Commission's 1993 order requiring refunds, Burlington had entered into settlements of its contract disputes with the two pipelines. The settlements had focused primarily on the problems posed by "take-or-pay" purchase obligations that the pipelines had found extremely onerous in the market conditions of the mid-1980s, but included language seeming to dispose of *all* claims relating to the contracts in question. See Northern 1989 Settlement Agreement para. 5, at 3 (releasing the parties "from any and all liabilities, claims, and causes of action, whether at law or in equity, and whether now known and asserted or hereafter discovered, arising out of, or in conjunction with, or relating to [the] said Contracts"); accord Panhandle 1992 Settlement Agreement para. 7, at 2. After the Commission resolved the uncertainty and required refunds of the Kansas tax reimbursements, Burlington denied any *ad valorem* tax liability to the two pipelines, arguing that its earlier settlements had released it from such claims. Notice of Petition for Adjustment, *Burlington Res. Oil & Gas. Co.*, FERC Docket No. SA99-1-000 (Nov. 12, 1998); Request for Resolution, *Burlington Res. Oil & Gas Co.*, FERC Docket No. GP99-15 (May 12, 1999).

The Commission eventually ordered hearings in the matter, *Northern Natural Gas Co.*, 102 FERC ¶ 61,003 (2003); *Panhandle E. Pipe Line Co.*, 102 FERC ¶ 61,002 (2003), and

ruled in favor of the pipelines, finding the Burlington Settlements to be unlawful and unenforceable, *Burlington Res. Oil & Gas Co.* ("*Northern Order*"), 103 FERC ¶ 61,005, *reh'g denied* ("*Northern Rehearing*"), 104 FERC ¶ 61,317 (2003); *Panhandle E. Pipe Line Co.*, 103 FERC ¶ 61,007, *reh'g denied*, 105 FERC ¶ 61,141 (2003). Because the NGPA forbids a purchaser from paying more than the maximum price for a first sale of gas, the Commission reasoned, it equally barred a post-hoc settlement agreement if "the producer [would] be permitted to *retain* the excess over the [maximum price ceiling]." *Northern Order*, 103 FERC ¶ 61,005, at 61,018 P 28 (emphasis added); see also *id.* at 61,017-18 PP 27-30. It ordered Burlington to refund the excess revenues the company had collected, resulting in the petition we granted in *Burlington I*.

\* \* \*

Before examining the Commission's proffered distinction between the Burlington and the Omnibus settlements, we must consider the actual meaning of the Burlington Settlements. On remand the Commission noted correctly that the Burlington Settlements' main purpose was to exchange immediate payments for a reduction in the pipelines' future "take-or-pay" obligations. It proceeded to announce that *ad valorem* liabilities "could not be eliminated in any take-or-pay settlement," *Remand Order*, 112 FERC ¶ 61,053, at 61,388 P 52, especially through the "boilerplate" language that Burlington employed, *Rehearing Order*, 113 FERC ¶ 61,257, at 62,020 P 69.

But we held in *Burlington I* that "the contract language does not reasonably permit exclusion of any claim that relates to payments made under the contracts," including "Northern's and Panhandle's refund claims against Burlington." 396 F.3d

at 411. Whether or not the *ad valorem* liabilities were within the main purpose of the settlements, they were within their language, written at a time when, as the background described above makes clear, the law was deeply unsettled and the parties would have had reason to seek accord. Northern suggests that we revisit our holding in *Burlington I*, portraying our construction as dictum and asking that the Commission, with the benefit of extrinsic evidence, be allowed to construe its settlement language first. But if Northern (which intervened in *Burlington I*) thought that any of our essential reasoning was in error, it should have petitioned for reconsideration, which it did not. *Burlington I*'s construction has thus become law of the case, which Northern cannot challenge here. See *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).

\* \* \*

*Burlington I* required the Commission to explain why, if it considered the Burlington Settlements to be unlawful and unenforceable, it had approved the ostensibly similar Omnibus Settlements. 396 F.3d at 411-12. The producers joining the Omnibus Settlements paid only a portion of their full refund liability to the pipelines, and in some cases their liabilities were forgiven entirely. Thus, they too had been allowed to retain excess revenues over the maximum price ceiling. In its initial effort (prior to our decision) to distinguish the two groups of settlements, the Commission attributed the differential treatment to the "prosecutorial discretion" the agency wields "in determining how to expend its resources in the enforcement of [the NGPA's] ceiling prices." *Northern Rehearing*, 104 FERC ¶ 61,317, at 62,191 P 26. Rather than take this assertion at face value, we charitably interpreted it in *Burlington I* as "betray[ing] a recognition that . . . the NGPA does not render unlawful all

private agreements allowing a producer to retain funds collected pursuant to unlawfully high prices." 396 F.3d at 411. We then remanded to the Commission for an explanation of which agreements were prohibited and why. See *id*. at 406, 411.

The Commission, however, appears too proud to accept such interpretive charity. It insists that "all such agreements"—including, it seems, the Omnibus Settlements—"are unlawful and unenforceable." *Remand Order*, 112 FERC ¶ 61,053, at 61,385 P 30; see also FERC Br. 7.

We find this line of argument no less baffling than we did in *Burlington I*. The Commission's approval of the Omnibus Settlements betrayed no hint that the agreements might be unlawful. Rather, the Commission found the settlements a "reasonable compromise," was "heartened by the parties' success," and "encourage[d] similar efforts to settle the *ad valorem* tax refund claims." *Northern Omnibus*, 93 FERC ¶ 61,311, at 62,076; see also *Panhandle Omnibus*, 96 FERC ¶ 61,274, at 62,044 ("We are also hopeful that all of the remaining disputes on the Panhandle system will be resolved through settlements in the near future."). We doubt any agency could coherently find a settlement "fair and reasonable and in the public interest" and "unlawful and unenforceable" all at the same time. *Remand Order*, 112 FERC ¶ 61,053, at 61,384 P 25, 61,385 P 30.

A second, and more important, reason for our disbelief is that the Commission enjoys prosecutorial discretion only when it acts as a prosecutor, which it is not doing here. Both in approving the Omnibus Settlements and in denying effect to the Burlington Settlements, it acted as an adjudicator, determining the merits of a legal controversy among adverse parties. While the Commission had ordered the pipelines to initiate proceedings against the producers (through the filing

of Statements of Refunds Due), the proceedings inevitably took the form of an adjudication, with adverse parties and competing claims of right. See, e.g., *Panhandle Omnibus*, 96 FERC ¶ 61,274, at 62,039 ("In accordance with procedures established by the Commission, Panhandle sought refunds from 836 operators . . . ."). The Commission was not itself a party to the Omnibus Settlements, but rather approved and accepted them as terminating proceedings among private parties. In the present case, moreover, the Commission affirmatively imposed liability on Burlington.

At most, the Commission may employ prosecutorial discretion in settling its *own* claims, by deciding "not to take additional enforcement actions" against private parties. *Remand Order*, 112 FERC ¶ 61,053, at 61,385 P 27. The Commission has power to initiate enforcement actions under the NGPA, and when the governing statutes are "utterly silent on the manner in which the Commission is to proceed against a particular transgressor," it may also refrain from initiating such actions. *Balt. Gas & Elec. Co. v. FERC*, 252 F.3d 456, 461 (D.C. Cir. 2001). Similarly, the Commission may settle a prosecution based in part on "whether a 'particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all.'" *Id*. (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

But the Omnibus Settlements were not merely a "termination of Commission enforcement actions," *Remand Order*, 112 FERC ¶ 61,053, at 61,385 P 30; they also purported to cancel or release the settling parties' own private claims. See *Northern Omnibus*, 93 FERC ¶ 61,311, at 62,075; *Panhandle Omnibus*, 96 FERC ¶ 61,274, at 62,040. Thus, in approving the settlements, the Commission exercised authority beyond that of a prosecutor and more akin to that of a court.

By exercising dispositive authority, it correspondingly narrowed its discretion.

* * *

Without prosecutorial discretion to rely on, the Commission must—as we said last time—either "recog[nize] that . . . the NGPA does not render unlawful all private agreements allowing a producer to retain funds collected pursuant to unlawfully high prices," *Burlington I*, 396 F.3d at 411, or accept that it erred by approving the Omnibus Settlements. In a simple case of inconsistency, the ordinary course would be to remand to the Commission, so that it may decide whether to abandon its earlier position or its new one. See, e.g., *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983); *Exxon Mobil Corp. v. FERC*, 315 F.3d 306, 308-09, 311 (D.C. Cir. 2003). Here, however, such reconsideration would be pointless, since we find the Commission's current position to be unsupported by law.

It is common ground that, by imposing a price ceiling on first sales of natural gas, the NGPA in a general sense invalidated any private agreement to pay more than the maximum lawful price. The Commission now reads this rule to prohibit any settlement agreement over past gas sales, even one reached in good faith and at arm's length, that allows a party to retain past payments that might later be construed (based on a rather special idea of how consideration is assessed) to embody prices exceeding the statutory price ceiling. See *Northern Order*, 103 FERC ¶ 61,005, at 61,017-18 PP 27-30; *Remand Order*, 112 FERC ¶ 61,053, at 61,387-88 PP 45-47; *Rehearing Order*, 113 FERC ¶ 61,257, at 62,016-17 PP 47-48. Thus, the Commission would forbid private parties from settling claims of uncertain value, if those

settlements turn out—once the uncertainty is resolved—to have left "excess" revenues in the seller's hands.

Such a reading goes far beyond the precedents on which the Commission relies. Under the filed rate doctrine the Supreme Court applied in *Arkansas Louisiana Gas Co. v. Hall* ("*Arkla*"), 453 U.S. 571 (1981), the rate filed with the Commission supersedes any price that private purchasers may have contractually agreed to pay. *Id.* at 582. We applied *Arkla* in *Southern Union Co. v. FERC*, 857 F.2d 812 (D.C. Cir. 1988), which concerned an agreement that accidentally misstated the nature of the gas to be delivered, describing it as intrastate gas not subject to the federal price ceiling. When the buyer realized the mistake and refused to pay above the maximum price, the seller sued in state court for negligent misrepresentation, obtaining an award of the difference between the price ceiling and the higher intrastate price that "should have been paid." *Id.* at 817 (emphasis omitted). We held this award invalid, as it directly enforced a contractual price term higher than the federal price ceiling: because the state judgment was "based upon, and ha[d] the effect of awarding, a price for interstate gas that . . . exceeds federal guidelines," the agreement was "simply . . . a bargain that the state has no power to enforce." *Id.* at 818.

Both *Arkla* and *Southern Union*, then, applied the same rule to prospective private agreements for the sale of gas: one cannot create a legal obligation, whether sounding in contract or in tort, to make a payment for future sales of more than the lawful price. *Southern Union* merely extended *Arkla* to contracts offering the parties a second means of recovery— through tort law. See generally Gregory Klass, *Contracting for Cooperation in Recovery*, 117 Yale L.J. 2 (2007). Whereas *Arkla* invalidated an agreement of the form, "I agree to pay more than the lawful price for gas," *Southern Union* did the same for an agreement of the form, "I agree to pay

more than the lawful price for gas, and you represent (negligently or not) that this gas is not within the scope of the price ceiling." It would have driven a rather large hole in the interstate price ceiling regime if a contractually created alternative legal theory had allowed the recovery of a supra-lawful price.

Neither *Arkla* nor *Southern Union*, however, laid down any rule with respect to retrospective settlement agreements concerning past payments for gas. Although the contract terms discussed in *Southern Union* were contained in a "settlement agreement," the terms (insofar as they were relevant to our decision) addressed *future* sales, and they were located in such an agreement only as part of the consideration for a release of unrelated claims. See *Southern Union*, 857 F.2d at 814-15 (declining to reach issues concerning a refund for past sales); see also *Southern Union Co.*, 35 FERC ¶ 61,359, at 61,818-19 (1986) (indicating that past sales were addressed through the refund). The Burlington Settlements, by contrast, create no liabilities for future gas sales, but merely resolve disputes over liabilities already accrued. These agreements to settle claims of past price-ceiling-violation are not the same as agreements to violate the price ceiling. Whereas for future deliveries of gas a buyer might well have an incentive to bid above the ceiling price (in order to secure the gas), no such motive seems likely to infect a bargain over past sales—and FERC makes no claim of any improper motive here.

Because of its misinterpretation of *Southern Union*, the Commission reasoned that a settlement of past *ad valorem* tax disputes is invalid unless one can determine "precisely what consideration, if any, Burlington may have given for the specific purpose of satisfying its [Kansas *ad valorem* tax] refund obligations." *Rehearing Order*, 113 FERC ¶ 61,257, at 62,017 P 52 (citing *Williams Natural Gas Co. v. FERC*, 3

F.3d 1544 (D.C. Cir. 1993)). The Commission evidently supposed that one would then have to compare this "precisely" calculated consideration with the (ultimately determined) maximum lawful price; only agreements providing consideration "equal to [the] refund obligation" would be valid. See *id.* at 62,017 P 49.

The Commission's theory completely miscomprehends the nature of settlements negotiated under conditions of uncertainty. It is true that for each past overpayment, the maximum-price rule provides the purchaser with a right to a full refund. But the law does not prevent purchasers from later exchanging those accrued rights for other valuable consideration. Even in a settlement purporting to settle a single issue, the Commission cannot insist that the exchange match the parties' exact obligations as ultimately determined; that would ignore the costs of formally resolving all uncertainties—costs that the Commission recognized when it spoke on remand of "the strong public policy that supports settling complex matters that thereby avoids the costs and burdens of litigation and mitigates administrative burdens." *Remand Order*, 112 FERC ¶ 61,053 at 61,384 P 25.

Moreover, our decision in *Williams*, which FERC invokes, considered a completely different question. There the pipeline claimed that it was entitled to pass along to customers the sums it had paid to gas producers in settlement of disputes over take-or-pay claims and certain gas pricing matters. Under the applicable rules, a pipeline could pass on *all* of its lawful payments for gas, but only *some* of its take-or-pay buy-out expenses. The settlements in *Williams* did not differentiate between the two sources of the aggregate amounts, and the Commission ruled that, in the absence of such pinpointing, the pipeline could not use the 100% recovery mechanism applicable to payments for gas. Though finding "merit" in the pipeline's argument that FERC's

distinction "elevate[d] the form of settlement payments over their substance," 3 F.3d at 1553, we nonetheless found the rule within FERC's discretion. *Williams* therefore involved FERC's responsibility to protect *customers*, non-parties to the settlements, from the adverse effects of transactions between pipelines and producers. It bears no apparent relevance to the present dispute between the pipelines and a producer over the enforceability of their agreed-upon settlement.

By contrast, while the NGPA presumably invalidated collusive settlements, there is no allegation that the Burlington Settlements were collusive in any way: Burlington and the pipelines appear to have negotiated in good faith and at arm's length, with every incentive to enforce their legal rights and with no apparent detriments to third parties. The parties had constructive notice that the Commission would soon revisit its treatment of the *ad valorem* taxes, and they were in a state of genuine legal uncertainty as to whether those taxes could be recouped.

In essence, the Commission holds that parties in such straits are forbidden from settling their disputes. Yet we have held in *Panhandle Eastern Pipe Line Co. v. FERC*, 95 F.3d 62 (D.C. Cir. 1996)—a case with remarkably similar facts—that the filed rate doctrine does no such thing. In *Panhandle*, as a result of a legal error on the Commission's part, a gas pipeline had billed a purchaser using a method that was later held to be unlawful under the filed rate doctrine. During a period of uncertainty, after a remand from this court but before the Commission had established a new standard, the parties attempted to settle their respective liabilities for a fixed sum. *Id*. at 65-67. The Commission subsequently disapproved the settlement, reasoning that if the purchaser had litigated the issue, the filed rate doctrine (correctly applied) would necessarily have required a larger refund than the settlement

provided. *Id*. at 67, 74. We described this as a "startling abuse" of the Commission's powers:

> [T]hat [the purchaser] would have fared better by fighting than by settling . . . is not a sufficient basis upon which to conclude that approving the settlement would be unfair, unreasonable, or contrary to the public interest. Parties settle in order to avoid the risk that they might do worse by litigating, both because they might lose and because winning might come at a high cost; both parties to a settlement accept the risk that they might have done better by fighting. It is perverse, therefore, to reject a settlement because later developments make one party's decision appear unwise. Rejecting a settlement upon such a flimsy ground only diminishes the incentive of future disputants to settle their cases.

*Id*. at 74.

*Panhandle*'s reasoning is equally applicable here. The pipelines would indeed have done better by preserving their claims, for (as it turned out) they were legally entitled to full *ad valorem* refunds. But the law does not prevent them from exchanging this entitlement for other goods.

Nor do the pipelines' second thoughts render the Burlington Settlements "contested," or their enforcement "coercive," as compared to the "uncontested" Omnibus Settlements, see *Remand Order*, 112 FERC ¶ 61,053 at 61,387-88 PP 43, 48-49, for the Burlington Settlements too were uncontested when they were signed. Just because Burlington now presents the settlements as defenses to liability, and the pipelines contest their meaning and legality, does not make the *settlements* "contested" within the meaning of the Commission's procedures for contested or uncontested settlement offers under 18 C.F.R. § 385.602. See *Remand*

*Order*, 112 FERC ¶ 61,053 at 61,387 P 43. Indeed, the factors on which the Commission justified its approval of the Omnibus Settlements are equally applicable to the Burlington Settlements, which *at the time* addressed complex claims, avoided future litigation, and resulted in an immediate exchange of consideration for the parties. The only difference is that the Burlington Settlements were made long ago, and with the advantage of hindsight one side now wants out. As we said in *Panhandle*, however, this is hardly a reason to disregard an otherwise lawful settlement.

* * *

As before, in the absence of a "reasoned and consistent explanation" for rejecting Burlington's defense, *Burlington I*, 396 F.3d at 412 (quoting *Associated Gas Distribs. v. FERC*, 893 F.2d at 349, 361 (D.C. Cir. 1989)), we grant the petition, vacate the orders under review, and remand the case to the Commission for it to proceed with the adjudication in accordance with this opinion.

*So ordered*.